**Opinion issued July 15, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NO. 01-24-00078-CV
_____

**ERIC PROFACA AND KRISTAAN DALE, Appellants**

**V.**

**BREEZE COACH LEASING, INC., TMARE, LLC, AND JOSEPH LYES, Appellees**

---

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-19954**

---

### MEMORANDUM OPINION

This personal injury appeal arises from a single-vehicle bus accident on Loop 610 in Houston. After leaving Dallas in the predawn hours, the bus somehow ran off the road and crashed into a concrete barrier as it attempted to merge onto Loop 610. The crash damaged the bus and threw the sleeping passengers around the inside of

the cabin. Several passengers suffered injuries. The wreck itself did not take anybody's life, but the bus driver had shown signs of illness for at least a week and died only two days later, so she could not testify to explain how and why she drove the bus off the road that morning.

Passengers Eric Profaca and Kristaan Dale filed suit. They persuaded a jury that the driver was negligent and won compensatory damages against the driver's employer, Breeze Coach Leasing, Inc. But the jury's award of combined damages totaling nearly $1.9 million was less than they believed was appropriate, so they appealed.

Profaca and Dale assert three issues on appeal. In the first two issues, they argue that the trial court gutted their case by excluding critical evidence. In the third issue, they argue that the jury charge misworded the definition of physical impairment.

Although the challenges to the trial court's evidentiary rulings have considerable force, we hold that the rulings did not cause an improper judgment. Appellants tried their case well enough to obtain a finding that the driver's negligence proximately caused the injuries they sustained in the bus crash. The trial fell short of perfect, but they have not established harm on this record. We further hold that the charged definition of physical impairment was correct. Accordingly, we affirm.

## Background

Tyler Marenyi is an electronic dance artist who performs concerts across the country under the stage name DJ Nghtmre. In December 2019, DJ Nghtmre embarked on the Portal Tour, which included performances in Dallas and Houston in February 2020, just before the COVID-19 pandemic. DJ Nghtmre formed TMARE, LLC to facilitate the tour. TMARE hired Joseph Lyes as the tour manager. The tour employed Profaca as a master electrician and Dale as the production manager. Profaca, Dale, and other members of the production crew traveled to each of DJ Nghtmre's performances.

The tour transported its equipment with an 18-wheeler truck, but it transported DJ Nghtmre and the crew in buses. TMARE leased two tour buses from Breeze for use on the Portal Tour: one bus transported DJ Nghtmre and the second bus transported eleven crew members, including Dale and Profaca. Breeze also provided drivers for the buses, and it hired Cynthia Lopez to drive the crew bus.

TMARE and Breeze entered into a written coach lease agreement concerning the buses.[1] Relevant here, the agreement provided that TMARE would assume certain duties, including "the Driver's compliance" with federal regulations:

> 6.  Lessee shall neither use nor allow the Coach(s) to be used for illegal purposes or otherwise subject the Coach(s) to confiscation. Lessee agrees not to permit the leased Coach(s)

---

[1]  Neither Breeze nor TMARE signed the lease agreement, but TMARE concedes on appeal that "[t]he parties agreed to live by the lease's terms anyway."

hereunder to be used in violation of any Federal, State, or Municipal statute, law, ordinance, rule or regulation applicable to the operation of such coach(s). . . .

\*\*\*\*

10. Lessor shall be solely responsible for the Coach's compliance with Federal Motor [C]arrier Regulations in response to U.S. Department of Safety implementation of the Motor Carrier Safety Act of 1984. . . . *Lessee shall be solely responsible for the Driver's compliance* with Federal Motor Carrier Regulations in response to U.S. Department of Safety implementation of the Motor Carrier Safety Act of 1984.

(Emphasis added.) One such regulation prohibits commercial drivers from operating a commercial vehicle whenever illness or the like would impair driving ability:

### § 392.3 Ill or fatigued operator.

No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle. However, in a case of grave emergency where the hazard to occupants of the commercial motor vehicle or other users of the highway would be increased by compliance with this section, the driver may continue to operate the commercial motor vehicle to the nearest place at which that hazard is removed.

49 C.F.R. § 392.3. Texas has adopted this regulation. *See* 37 TEX. ADMIN. CODE § 4.11(c)(3) (Tex. Dep't of Pub. Safety, General Applicability and Definitions) ("All regulations contained in Title 49, Code of Federal Regulations, Parts 40, 380, 382, 385–387, 390–393 and 395–397, and all interpretations thereto pertaining to interstate drivers and vehicles are also adopted except as otherwise excluded.").

4

DJ Nghtmre performed in Dallas on February 28, 2020. The crew had traveled by bus for eleven days. The plan called for an overnight bus trip to Houston for a show the following day, and then a few days' bus trip to a show in San Diego. Unfortunately, matters did not go exactly according to plan. There were reports that bus driver Lopez had become ill.

Lyes, the tour manager, emailed a contact person at Breeze, passing on what he had heard about the driver:

> Hey Jennifer
>
> We need to get Cynthia [Lopez] off the road after Houston, she isn't healthy enough to carry on.
>
> Kris our PM is worried for her health and the guys on the bus. She's vomiting on the side of the road and hasn't told me about it.
>
> How should we proceed? It needs to happen after Houston.
>
> Thanks
>
> Joe Lyes
> Tour Manager | NGHTMRE & GUD VIBRATIONS

In response, Breeze's contact person expressed serious concern:

> OMG! Why hasn't she told anyone out there or called me?! That's not safe.
>
> Can you email me your schedule for the remainder of the tour. I will work on this now.

Various witnesses described Lopez during the days leading up to the wreck as "just not herself," "lethargic," and "really sick." In the moments just before leaving Dallas, Lopez was seen "asleep in the rear lounge of the bus with her hair on the

floor,"[2] as well as nodding, moaning, and in "kind of like a fetal position." She delayed the crew bus leaving Dallas for nearly an hour, and one crew member testified that she drove on "the rumble strips multiple times a night."

On the other hand, other reports indicated that Lopez felt well enough to drive to Houston, and no eyewitness actually saw her vomit. Whatever her ailment, Lopez had been well enough to drive the bus safely for eleven days leading up to the Dallas show. Details about her condition remain murky because she did not live to testify and because so many of the reports about her condition were hearsay.

On the morning of February 29, 2020, after leaving Dallas late, Lopez arrived in Houston with eleven crew members asleep in the bus. The weather was clear. Lopez exited Interstate 45 for Loop 610 driving just under 35 miles per hour. While attempting to merge onto Loop 610, she crashed into a stationary concrete barrier on the side of the road. The bus came to a stop on top of the barrier.

Police and paramedics arrived on the scene, stabilized the bus, and removed Lopez and the crew members from the bus. Profaca, Dale, and several other crew members claimed injuries from the crash. A police officer who responded to the crash reported that the bus "was attempting to merge" onto the highway "when the driver's door came open." Lopez "attempted to pull to the side of the road to fix the

---

[2]    Profaca testified that Lopez's "weave" was "on the floor," which concerned him because he had "never seen her without her hair on."

door, but did not see the start to the barrier wall and ran into it." Lopez went to the hospital, where she complained of "pain and difficulty breathing" and had a low blood-oxygen level. She died two days later, and there is no definitive evidence showing whether she died from her illness, the crash, or some unrelated malady.

Profaca and Dale filed suit against Breeze, and they later added claims against TMARE and Lyes. Profaca and Dale asserted claims for negligence, gross negligence, negligence per se, and several direct negligence claims, including negligent training, negligent supervision, negligent entrustment, and negligent maintenance or inspection. Breeze admitted in its answer that Lopez was its employee and acting in the course and scope of her employment when the bus crashed. Prior to trial, several other crew members who were allegedly injured in the bus crash intervened in the lawsuit as plaintiffs, and several parties affiliated with the Portal Tour were added as defendants.[3] The only parties remaining for trial, however, were Profaca and Dale as plaintiffs and Breeze, TMARE, and Lyes as defendants.

---

[3] Ellington Smith was originally named as a plaintiff, and Christopher May, Mitchell Rubensteen, Matthew Gill, Codie Early, and Jacob May intervened in the lawsuit as plaintiffs. The claims against the other defendants—Hashtag Jukelife, LLC, Nghtmre Productions LLC, Gud Vibrations, LLC, and Maktive Event Production— were eventually dismissed through a special appearance (for Gud Vibrations) and summary judgment (for Hashtag Jukelife, Nghtmre Productions, and Maktive). These individuals and entities are not parties to this appeal.

During a pretrial conference and throughout trial, Lopez's illness became an evidentiary flash point between the parties. The dispute arose from TMARE and Lyes' motion in limine. The first limine—entitled "Illness or Death of the Bus Driver"—sought to limit Profaca and Dale from introducing evidence of "[a]ny discussion or suggestion the commercial driver [Lopez] was ill, died of an illness, died of complications from the crash, and/or the driver's alleged illness contributed to the crash." The limine further argued that:

> Plaintiffs and Intervenors have absolutely no admissible evidence the driver was impaired by illness or that her alleged illness proximately caused the crash. The driver's alleged illness and/or death is irrelevant or, in the alternative, the probative value is substantially outweighed by the danger of unfair prejudice and/or misleading the jury.

Breeze made the same argument in its motion in limine.

But the defendants went beyond merely requesting that counsel approach the bench before discussing Lopez's illness and death. They asked for outright exclusion. The trial court granted it. The court excluded all evidence of driver illness and any mention of the federal regulation quoted above that addresses driver illness, including evidence that TMARE was contractually bound under the lease agreement to ensure Lopez's compliance with the regulation. *See* 49 C.F.R. § 392.3.

Although these disputes first arose in the context of pretrial limine discussion, the trial court solidified its position and clarified that it was excluding the evidence: "The Court has made a decision. You can put it on the record all you want." The

court ruled definitively: "The Court has made its ruling on that. So let's just move on from that." Plaintiffs responded that they respected the ruling but would therefore need to keep making offers of proof, to which the court replied, "Right. That's fine." No evidence of Lopez's illness, including the federal regulation concerning driver illness and impairment and the Breeze-TMARE lease agreement, was admitted at trial.

The trial court also excluded evidence from three testifying doctors that the bus crash caused Profaca and Dale's injuries. Two of the doctors testified that they had treated Profaca and Dale for numerous injuries after the bus crash.[4] A third doctor, who created lifecare plans for but did not treat Profaca and Dale, testified about their past and future medical care costs. But when Profaca and Dale's counsel asked these doctors whether the injuries and related costs were caused by the bus crash, defense counsel objected on the ground of speculation. Outside the jury's presence, defense counsel argued that Profaca and Dale both had serious preexisting injuries which the doctors had not considered in reaching their expert opinions. The trial court sustained the objections.

---

[4]      Profaca injured his back, neck, and dental implants, and he showed signs of a traumatic brain injury. Dale injured his back and neck, and he was diagnosed with a traumatic brain injury.

At the close of evidence, TMARE and Lyes moved for directed verdict on the grounds that they had no control over the driver and that they did not breach a duty in any event. The court granted the directed verdict for both TMARE and Lyes.

Breeze filed a separate motion for directed verdict, which the trial court granted in part. The court directed a verdict for Breeze on Profaca and Dale's claims of gross negligence, negligence per se, and negligent training, supervision, entrustment, maintenance, and inspection. But the court allowed the case to go to the jury on a question about simple negligence by Lopez.

At a charge conference, the parties raised objections to various parts of the charge. The trial court overruled all objections.

The charge submitted to the jury asked about liability only in Question 1: "Did the negligence, if any, of Cynthia Lopez proximately cause the occurrence in question?"[5] The charge instructed the jury not to consider any evidence about training, supervision, or entrustment, or about bus maintenance or inspection. The jury answered "Yes" to the liability question.

The jury then answered two more questions about actual damages for Profaca and Dale, respectively. During closing arguments, Profaca and Dale requested awards of about $30 million each. Breeze did not dispute that they were injured in

---

[5] This liability question differed from its counterpart in the draft jury charges that the parties had proposed earlier in the case, in that the draft version had a blank for Breeze, not Lopez.

the bus crash, but it questioned their evidence of damages. Breeze suggested that the jury award Profaca and Dale $100,000 each.

In Question 2, the jury found that Profaca had sustained $1,008,800 in damages:

    a.    Medical care in the past – $262,500

    b.    Medical care in the future – $202,800

    c.    Pain in the past – $90,000

    d.    Pain in the future – $25,000

    e.    Mental anguish in the past – $50,000

    f.    Mental anguish in the future – $21,000

    g.    Earning capacity in the past – $175,000

    h.    Earning capacity in the future – $80,000

    i.    Disfigurement in the past – $0

    j.    Disfigurement in the future – $2,500

    k.    Physical impairment in the past – $50,000

    l.    Physical impairment in the future – $50,000

In Question 3, the jury found that Dale had sustained $878,023 in damages:

    a.    Medical care in the past – $159,745

    b.    Medical care in the future – $142,778

    c.    Pain in the past – $75,000

    d.    Pain in the future – $25,000

    e.    Mental anguish in the past – $100,000

    f.    Mental anguish in the future – $75,000

    g.    Earning capacity in the past – $108,500

h.      Earning capacity in the future – $62,000

i.      Disfigurement in the past – $2,500

j.      Disfigurement in the future – $2,500

k.      Physical impairment in the past – $50,000

l.      Physical impairment in the future – $75,000

The trial court signed a final judgment on the jury's verdict. The judgment stated that Breeze, as Lopez's employer, was liable to Profaca and Dale for the jury's damages awards. The judgment also assessed pre- and post-judgment interest and costs. The judgment also ordered that Profaca and Dale take nothing from TMARE and Lyes.

Profaca and Dale moved for a new trial. In their motion, they argued at length that the evidentiary rulings had seriously harmed their case against Breeze. They also argued that the court erred in granting directed verdicts for appellees and in submitting a jury charge that contained improper instructions. The motion was overruled by operation of law. *See* TEX. R. CIV. P. 329b(c). This appeal followed.

**Evidentiary Rulings**

In their first two issues, Profaca and Dale contend that the trial court reversibly erred by excluding certain evidence.

**A.      Standard of Review**

Appellate courts review a trial court's ruling to exclude evidence for an abuse of discretion. *See Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020); *Owens-*

12

*Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). A trial court abuses its discretion if it acts without regard for any guiding rules and principles. *Malone*, 972 S.W.2d at 43 (quotation omitted). But even if the trial court errs in excluding evidence, we may not reverse a judgment for an erroneous ruling unless we determine that the error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case. TEX. R. APP. P. 44.1(a); *see Malone*, 972 S.W.2d at 43.

"Exclusion [of evidence] is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018). But "even if the exclusion of evidence is crucial to a key issue, it is '*likely* harmful,' not conclusively or per se harmful." *Id.* We evaluate harm in light of the whole record. *Id.*; *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000).

**B.    Exclusion of Evidence Concerning Liability**

In their first issue, Profaca and Dale assert that the trial court erred in excluding evidence about three related topics:

(1)    the illness of bus driver Lopez, who had been ill for days, who said she could make the trip from Dallas to Houston, and who then passed away shortly after the incident;

(2)    the federal regulation (49 C.F.R. § 392.3) that governs driver illness and fatigue as they pertain to driver impairment; and

13

(3)    the contract between Breeze and TMARE, in which TMARE promised Breeze to be "solely responsible" for driver compliance with federal motor carrier regulations.

They decry what they call "a series of devastating, erroneous evidentiary rulings that presented a woefully incomplete account of the bus crash." As a result, they seek a new trial.

Appellees disagree with this legal analysis at every turn. In their view, "this case is about a 33.5 mph (at most) bus accident and Plaintiffs' request for nearly $60 million in damages[.]" They contend that the evidentiary complaints are unpreserved, wrong on the merits, and defeated by the harmless error rule.

## 1.    Preservation of Error

Appellees contend that Profaca and Dale did not preserve error on their first issue because they did not obtain additional rulings on their offers of proof. We disagree.

Profaca and Dale obtained definitive rulings excluding evidence concerning Lopez's illness, including the federal regulation and the TMARE-Breeze lease agreement. They then made several offers of proof. Contrary to appellees' suggestion that Profaca and Dale should have gone further by obtaining an additional ruling after putting their offers on the record, no additional rulings were necessary.

This Court has described error preservation in terms of obtaining a ruling first and then—if the trial court rules the evidence inadmissible—presenting the offer to memorialize the evidence in question:

> To preserve error in the exclusion of evidence, a party must (1) attempt during the evidentiary portion of the trial to introduce the evidence; (2) if an objection is lodged, specify the purpose for which [the evidence] is offered and give the trial court reasons why the evidence is admissible; (3) obtain a ruling from the court; and (4) if the court rules the evidence inadmissible, make a record, through a bill of exceptions, of the precise evidence the party desires admitted.

*Ulogo v. Villanueva*, 177 S.W.3d 496, 501–02 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(2). Appellants followed this scheme to the letter. They repeatedly tried to introduce the evidence, explained their position, obtained an adverse ruling, and made a record of the evidence they wanted admitted.

To the extent that appellants needed to do anything further to preserve their complaints, they did so when, in response to the trial court's comment to "put it on the record all you want," they stated that they would have to present their offers of proof, and the court replied, "Right. That's fine." This colloquy set the stage for implicit rulings thereafter: any such offer of proof that came later and was not allowed in was implicitly being excluded. *See* TEX. R. APP. P. 33.1(a)(2). In other words, the trial court made clear that the evidence was excluded and that, while appellants could put their offers on the record, the court had made up its mind.

15

Appellants had no duty to follow up each offer by effectively asking, "Judge, are you still sure?" *See id.* We therefore conclude that Profaca and Dale preserved their complaints about the trial court's evidentiary rulings for appellate review.

## 2. Admissibility and Harm

We next consider whether the exclusion of the evidence constituted error, and if so, whether the error caused harm.

### a. Driver illness

The trial court excluded all evidence about the bus driver's illness. This excluded evidence included reports from crew members that Lopez had been ill before driving to Houston, as well as the email from Lyes to a Breeze representative concerning Lopez's reported illness.

Profaca and Dale forcefully contend that this evidence was relevant and admissible. They invoke Professor McCormick's famous phrase about the low bar for establishing mere relevance—namely, that a brick is not a wall. *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994) ("As Professor McCormick succinctly put it, 'a brick is not a wall.'") (quoting CHARLES T. MCCORMICK, HANDBOOK OF THE LAW OF EVIDENCE § 152 (West ed. 1954)). To illustrate this point, Profaca and Dale point to the *JBS Carriers* decision, in which the Texas Supreme Court framed the admissibility issue in terms of whether the evidence "provides insight" into relevant issues:

> Evidence that a party to an accident was intoxicated or impaired is not, in and of itself, evidence that the party acted negligently in relation to the accident. However, such evidence is probative if it is relevant to a party's actions in conforming or failing to conform to an appropriate standard of care.
>
> ****
>
> The same analysis applies to evidence of a mental health issue in negligence cases—it is relevant when other evidence supports a finding that the mental impairment contributed to the party's allegedly negligent actions. As with evidence of drug or alcohol usage, evidence of a mental health condition is not invariably relevant. But courts have held mental health evidence admissible when it provides insight into relevant issues in the case.

*JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836–37 (Tex. 2018) (citation omitted).

The supreme court found the evidence in *JBS Carriers* relevant to the person's vigilance, judgment, and reactions. *Id.* at 838 (quotation omitted). Other decisions strongly point the same way. *See Adair v. Chapla*, No. 09-21-00372-CV, 2024 WL 718714, at *12 (Tex. App.—Beaumont Feb. 22, 2024, pet. denied) (mem. op.) ("[E]ven if the person's impairment from a substance or combination of substances doesn't rise to a level of illegal intoxication, evidence that shows a driver was impaired when offered to explain why a driver was operating a vehicle in a manner relevant to a wreck is admissible under Rule 403."); *see also Kaminski v. Mayer*, No. A-6580-06T1, 2008 WL 5204738, at *7–10 (N.J. Super. Ct. App. Div. Dec. 15, 2008) (per curiam) (upholding admissibility of evidence showing driver illness shortly before accident, especially where unwell driver passed away soon thereafter).

On the logic of these decisions, we will assume arguendo that the trial court erred in excluding the proffered evidence about Lopez being ill. Nevertheless, this evidence does not establish harm. Lopez's illness goes to whether she breached the standard of care, and the jury still found Lopez negligent even without the evidence. To extend Professor McCormick's metaphor, appellants' wall of liability evidence already had many bricks, such as the cornerstone fact that prudent drivers in sunny weather do not typically crash into stationary highway barriers. *See Gunn*, 554 S.W.3d at 668 (stating that ruling excluding evidence is likely harmless if evidence was cumulative or if evidence was so one-sided that error likely made no difference in judgment). The jury's affirmative liability finding could not have been more favorable to Profaca and Dale. This finding paved the way for the money judgment that they were awarded.

For this reason, excluding the evidence was not harmful. *See Env't Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 426 (Tex. 2015) ("We need not address the admissibility of the settlement agreement, however, because the jury found in EPS's favor."); *Bartosh v. Gulf Health Care Ctr.-Galveston*, 178 S.W.3d 434, 444 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("Because Bartosh prevailed on the issue of Gulf Health's liability, the exclusion of this evidence could not be harmful error in relation to that issue.").

Under classic principles of harm analysis that date back to adoption of the harmless error rule in 1912, the complaining party has the burden to show probable harm. *See Wood v. Wiggins*, 650 S.W.3d 533, 562 (Tex. App.—Houston [1st Dist.] 2021, pet. denied). No such showing is made where evidence of liability was excluded but the complaining party prevailed on liability anyway. *FPL Farming*, 457 S.W.3d at 426; *see also Holeman v. Landmark Chevrolet Corp.*, 989 S.W.2d 395, 402 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Morriss v. Centex Paving Co.*, 348 S.W.2d 790, 793–94 (Tex. App.—Eastland 1961, writ ref'd n.r.e.). No matter how erroneous the decision to exclude the evidence concerning Lopez's illness, that exclusion did not cause harm.

### b.    Federal regulation about driver illness

The trial court also excluded evidence of a federal regulation concerning drivers who are impaired by illness. As quoted above, the federal regulation at issue provided that:

> No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.

49 C.F.R. § 392.3.

But the same logic discussed above regarding evidence of Lopez's illness applies equally to the exclusion of evidence about Section 392.3. Even if we assume

19

that the trial court erred in refusing to admit evidence about the regulation, appellants still obtained an affirmative finding as to driver negligence as a proximate cause of the bus crash. Under the authorities cited earlier, appellants have not established any harm from the exclusion of the federal regulation. *See FPL Farming*, 457 S.W.3d at 426; *Bartosh*, 178 S.W.3d at 444; *Holeman*, 989 S.W.2d at 402.

Profaca and Dale maintain that Section 392.3 was relevant to the standard of care. And as a matter of fact, regulations often bear on the standard of care. *See Reddic v. E. Tex. Med. Ctr. Reg'l Health Care Sys.*, 474 S.W.3d 672, 676 (Tex. 2015) (per curiam) ("[W]e do not necessarily disagree with the proposition that applicable regulations in some instances might bear on or evidence a standard of care."); *Hernandez v. Nueces Cnty. Med. Soc'y Cmty. Blood Bank*, 779 S.W.2d 867, 871 (Tex. App.—Corpus Christi–Edinburg 1989, no writ) ("It is well-established that state health regulations, national standards, and organizational bylaws are admissible to define the standard of care customarily offered.").

Nevertheless, Section 392.3 does not add a great deal to resolving the case. The primary issue is whether Lopez was negligent, not whether somebody else violated a regulation about driver impairment. A Georgia appellate court decision illustrates the point:

> The dispositive causal issue in this case is not whether Anthony was negligent in violating the Federal Motor Carrier Safety Regulations, but whether Anthony was negligent in running the red light. The proximate cause of the accident was the failure to yield the right of way, not the

20

failure to follow federal regulations. Anthony's inattention or fatigue may have explained his failure to yield the right of way (and is a factor Parker vociferously argued to the jury here), but whether his fatigue violated a federal regulation is irrelevant. If the light was green at the time that Anthony approached and went through it, his relative fatigue or lack thereof (and whether such violated federal regulations) would be irrelevant, as he would have had the right of way to proceed through the intersection whether fatigued or not. If the light had been red, the violation of the federal regulation would similarly be irrelevant, as he would have been obligated to stop at the intersection regardless of whether he was also in violation of a federal regulation.

The running of the red light, and not the violation of 49 CFR § 392.3, was the proximate cause of the accident. A charge on 49 CFR § 392.3 was unnecessary, as it was not adjusted to the facts of the case as tried.

*Parker v. R&L Carriers, Inc.*, 560 S.E.2d 114, 115 (Ga. Ct. App. 2002). In other words, the focus belongs on the driver and her driving—and her illness, at least to the extent that it relates to her driving—but not on the regulation as such.

### c. Contract between Breeze and TMARE

The trial court also prevented Profaca and Dale from relying on the lease agreement between Breeze and TMARE to establish that TMARE and Lyes owed them a duty.[6] Under the lease agreement, TMARE agreed to ensure that Lopez complied with applicable federal motor carrier regulations, including Section 392.3.

The trial court's exclusion of the Breeze-TMARE lease agreement presents a somewhat different issue than we previously addressed. The harm analysis is

---

[6] Appellants contend that Lyes owed them a duty under the lease agreement because he was TMARE's vice principal. *See Bennett v. Reynolds*, 315 S.W.3d 867, 883–84 (Tex. 2010). For the same reasons discussed below, we reject this argument.

clouded by the fact that TMARE made its contractual promise to ensure Lopez's compliance with Section 392.3 to Breeze, not to travelers in general or to Profaca and Dale in particular. Texas law begins with the proposition that this contractual obligation about driver compliance ran only to Breeze: "Traditionally, Texas courts have maintained a presumption against third-party beneficiary agreements."[7] *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011); *see Corpus Christi Bank & Tr. v. Smith*, 525 S.W.2d 501, 503–04 (Tex. 1975) ("[W]e must begin with the presumption that parties contract for themselves.").

Perhaps for this reason, appellants do not claim to be third-party beneficiaries under the lease agreement. Rather, they claim to benefit from a tort duty arising out of a voluntary undertaking. That claim is unpersuasive. A negligent undertaking duty requires a showing of either reliance on or increased risk from a defendant's performance of services. *Nall v. Plunkett*, 404 S.W.3d 552, 555–56 (Tex. 2013); RESTATEMENT (SECOND) OF TORTS §§ 323–324A. This Court has taken care to enforce those requirements. *See Garcia v. Kellogg Brown & Root Servs., Inc.*, No. 01-19-00319-CV, 2020 WL 3820426, at *10 (Tex. App.—Houston [1st Dist.] July 7, 2020, no pet.) (mem. op.); *Bauer v. Gulshan Enters., Inc.*, 617 S.W.3d 1, 25–27 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g). Those

---

[7]     The contract chooses Tennessee law, but no party has briefed the law of that state. Accordingly, our analysis will follow suit and apply Texas law.

22

requirements have not been met here. The contract between Breeze and TMARE, whatever its meaning, was irrelevant to the tort issues in the case, so the trial court did not err by excluding it.

If Profaca and Dale sought to apply the jury's findings as a basis for a judgment against TMARE, the contract might give them a right to relief. But they do not ask for that. Rather, they disagree with the jury's damage findings and want another trial against TMARE. But such a request cannot lead anywhere unless they can show TMARE owed a duty, and they have not shown one.

### 3. Allegations of Gross Negligence and Non-Respondeat Superior Theories of Negligence

This would dispose of the first issue, were it not for the fact that appellants also asserted claims against appellees for gross negligence and other theories of negligence, including negligent supervision, negligence per se, negligent training, negligent entrustment, and negligent maintenance or inspection. Appellants argue that the excluded evidence—that is, Lopez's illness, Section 392.3, and the lease agreement—bore on these theories and resulted in the directed verdict rulings. They emphasize the allegations of gross negligence: "Any of these categories is enough to show the trial court's error, the evidence of Ms. Lopez's illness—and, specifically, Defendants' knowledge of that illness—was the linchpin of Plaintiffs' gross-negligence claims against Defendants."

### a.      Gross negligence

Profaca and Dale argue that appellees acted with gross negligence by letting an obviously unwell bus driver take to the highway and thereby jeopardize the lives and well-being of innocent passengers. This argument gives the Court pause. And we might be inclined to accept it under the standards that existed prior to today's Civil Practice and Remedies Code Chapter 41. But the adoption of those exacting standards has made gross negligence more difficult to establish. Having reviewed the record in its entirety, we conclude that there is insufficient evidence of gross negligence. That is, the record contains a brick, but not enough bricks to make a wall.

*Moriel* represents a classic case of an appellate court seeing a brick but not a wall. When the supreme court endorsed Professor McCormick's adage about a brick not being a wall, it did so in the course of distinguishing between materiality and sufficiency: "Simply because a piece or pieces of evidence are *material* in the sense that they make a 'fact that is of consequence to the determination of the action more . . . or less probable,' does not render the evidence *legally sufficient*." *Moriel*, 879 S.W.2d at 24–25 (quoting TEX. R. CIV. EVID. 401).

It is well-settled that gross negligence has an objective prong and a subjective prong. *Medina v. Zuniga*, 593 S.W.3d 238, 247 (Tex. 2019) (quotation omitted). To establish gross negligence, a plaintiff must prove that (1) when viewed objectively

24

from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. TEX. CIV. PRAC. & REM. CODE § 41.001(11); *see Medina*, 593 S.W.3d at 247 (quotations omitted).

The objective prong requires courts to examine "the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight." *Moriel*, 879 S.W.2d at 23. Whether a risk qualifies as extreme is a function of both the magnitude and probability of the potential injury. TEX. CIV. PRAC. & REM. CODE § 41.001(11)(A). An extreme risk is "not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff." *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (per curiam) (quoting *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998)).

The subjective prong requires actual, subjective awareness of the extreme risk and conscious indifference to the risk. *Medina*, 593 S.W.3d at 247 (quotation omitted). This presents an issue of the actor's mental state: "what separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show that the defendant knew about the peril, but his acts or

omissions demonstrate that he did not care." *Diamond Shamrock Refin. Co. v. Hall*, 168 S.W.3d 164, 173 (Tex. 2005) (quoting *La.-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 246–47 (Tex. 1999)).

Only actual, subjective awareness of the specific risk will satisfy the standard. *See id.* ("[T]here is no clear and convincing evidence that Diamond Shamrock knew of the risk of the compressor explosion that resulted in Hall's death and yet did not care."); *Andrade*, 19 S.W.3d at 248 ("Given the Kirby managers' testimony that they actually, subjectively believed that they had locked out the crane or witnessed someone else do so before Andrade began working, the failure to maintain a written lock-out policy is not evidence that the managers were consciously indifferent to the risks posed to Andrade by the crane[.]").

Finally, the evidence must meet the clear and convincing standard of proof. TEX. CIV. PRAC. & REM. CODE § 41.003(a)–(b); *see U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012). "Clear and convincing" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM. CODE § 41.001(2). Such evidence may be either direct or circumstantial, but proof of ordinary negligence or bad faith does not suffice. *Id.* § 41.003(b); *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001).

Under these standards and supreme court precedent applying them, we conclude that the record contains evidence of ordinary negligence but not gross negligence. This is because there is no evidence that Lopez's actions involved an extreme degree of risk. *See Medina*, 593 S.W.3d at 247. True, there is evidence that Lopez was sick. Several crew members reportedly knew that she was sick before the trip to Houston. Based on these reports, Lyes sent an email to Breeze stating, "We need to get Cynthia [Lopez] off the road after Houston, she isn't healthy enough to carry on. Kris our PM is worried for her health and the guys on the bus. . . . It needs to happen after Houston." When the crew members were ready to leave Dallas to drive to Houston early in the morning, Lopez was resting in the back of the bus. During the drive to Houston, one crew member recalled that she drove over rumble strips on the shoulder of the highway. Some post-accident medical records indicated that Lopez had difficulty breathing and a low blood-oxygen level after the crash, and she died of unknown causes two days later.

But appellants presented no evidence that Lopez's illness impaired her ability to drive or that appellees knew of any such impairment. She had been driving for eleven days prior to the Dallas show, and no evidence indicates that she had any difficulty doing so. *See Moriel*, 879 S.W.2d at 23 (stating that determination of whether risk is extreme requires courts to examine events and circumstances from viewpoint of defendant at time events occurred, "without viewing the matter in

27

hindsight"). None of the crew members testified about any symptoms that impaired her ability to drive. Lyes' email did not state that Lopez was impaired by illness. True, he stated that "she isn't healthy enough to carry on," but he also asked Breeze to replace her after Houston. At most, the email indicates that Lopez was ill, and Breeze needed to replace her to protect her health and that of the other crew members on the bus. The email does not, however, indicate that Lopez's illness impaired her ability to drive. *See id.*

In short, the risk here appears no greater than that which the court held insufficient in *Medina v. Zuniga*, another vehicular accident case. *See* 593 S.W.3d at 249 ("Viewing the evidence in favor of the jury's verdict, no doubt exists that Medina's driving was thoughtless, careless, and risky. But any driver knows that our roads are replete with thoughtless, careless, and risky drivers. Gross negligence can be supported only by an extreme degree of risk, not 'a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff.'") (quoting *Ellender*, 968 S.W.2d at 921); *see also Boerjan*, 436 S.W.3d at 312 ("Simply following a trespasser's truck is a far cry from the sort of objective risk that would give rise to gross negligence.").

### b. Other theories of negligence

Appellants' alternate theories of negligence add nothing to the facts of this case. Appellants do not contend that an affirmative finding in answer to, say, a

negligent supervision question would have increased their recovery or improved their legal position. The same holds true for their theories of negligent entrustment and the other negligence theories.

In resolving this sub-issue, it may be useful to examine how the parties have addressed the question of harm. Appellants' opening brief primarily focuses on whether the trial court's evidentiary rulings were erroneous. But they argue that harm resulted from the court's granting of the directed verdicts on the alternate negligence theories: "[E]xclusion of that evidence was harmful, for it left [appellants] unable to withstand Breeze's, TMARE's, and Mr. Lyes's motions for directed verdicts."

In response, appellees contend that the damage findings are the damage findings. TMARE and Lyes' brief reasons as follows:

> All the addition of potentially liable parties would do is potentially change who pays what percentage of the damages. The same is true for other theories of liability, like negligent training or entrustment—they would just be other reasons that the occurrence happened. The damages caused by the occurrence remain fixed by what the jury found in response to Questions 2 and 3. In other words, the addition of potentially liable parties or potential theories of liability for Question 1's liability question would not have any effect on the damages—found by the jury—that arose from the occurrence.
>
> The jury found damages from the occurrence, so the addition of potentially liable parties or the addition of liability theories have no bearing on the damages found from the occurrence, [and] the exclusion of this evidence was harmless.

Breeze takes a similar position about the end result being identical:

In light of the jury's finding that Lopez's negligence proximately caused the accident, Plaintiffs failed to show how the admission of evidence of Lopez's illness or the FMCSA regulation would have somehow resulted in the jury awarding more damages to Plaintiffs. Therefore, Plaintiffs have failed to demonstrate how any error caused by the excluded evidence would have resulted in the rendition of an improper judgment as to the compensatory damages Plaintiffs seek.

Thus, both briefs on appellees' side challenge appellants to explain how there is any harm.

In replying to these arguments about harmlessness, appellants do not deny the logical force of the defense position. Instead, they acknowledge the point and then quickly fall back to their gross negligence claim:

TMARE, though, insists that the directed verdict on Plaintiffs' negligence claims was harmless because other liability findings would not change Plaintiffs' damages awards. But that citation-less argument (a hallmark of TMARE's brief) overlooks Plaintiffs' gross-negligence claim. Had that claim been presented to the jury, it could have—and indeed likely would have—resulted in an award for exemplary damages.

(Citation omitted.) On this record, and in light of these arguments, we agree that Profaca and Dale have not carried their burden to show harm. All the alternate theories of negligence would have led to exactly the same damages.

In sum, had all defendants and all negligence theories stayed in at trial, the parties might have vigorously debated (1) how the alternate theories work, as a doctrinal matter, and (2) how to word the liability portions of the charge in light of

30

Civil Practice and Remedies Code Chapter 33.[8] But no matter how the liability portion of the charge was worded, appellants do not dispute that the liability questions would have fed into the same damage findings. Nor do appellants claim that they would have been any better off. Thus, they have not established harm from the evidentiary rulings.

Profaca and Dale point out that a gross negligence finding would have made all the difference. In light of the tight strike zone created by Chapter 41 and illustrated by cases such as *Medina* and *Boerjan*, however, the gross negligence theory was not viable under today's standards.

We overrule appellants' first issue.

## C.    Exclusion of Evidence Concerning Causation of Injuries

In their second issue, Profaca and Dale contend that the trial court erred in excluding some of their expert testimony relating to whether the crash caused their injuries. They called two treating physicians and one non-treating physician to testify at trial. Dr. Ruben Bashir and Dr. Geremy Sanders—the two treating doctors— testified at length about their treatment of Profaca and Dale after the bus crash. But

---

[8]    *See* TEX. CIV. PRAC. & REM. CODE §§ 33.001–.017; *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W.2d 661, 665–66 (Tex. 1999) (discouraging redundant questions: "While trial courts should obtain fact findings on all theories pleaded and supported by evidence, a trial court is not required to, and should not, confuse the jury by submitting differently worded questions that call for the same factual finding").

whenever they were asked whether the crash caused the injuries, appellees objected to the testimony as speculative. The details deserve some attention because there is a dispute about what was preserved.

The three doctors testified in succession. Dr. Sanders testified first. He is double board certified and practices interventional pain management. He treated Profaca but not Dale. He had treated Profaca more than twenty times by the time of trial and was still treating him. He diagnosed Profaca with cervical radiculopathy. When asked whether the pain and limitations that Profaca had in his neck and back were related to the crash, Dr. Sanders answered yes. But appellees objected when appellants' counsel asked directly about causation:

> Q.         In your medical opinion was the cause of Mr. Profaca's ongoing pain and limitations the result of this bus crash?
>
> Defendants: Objection, Your Honor. Calls for speculation.
>
> The Court:   The objection is sustained.

A few questions later, however, Dr. Sanders answered yes when asked if Profaca's injuries were related to the bus crash:

> Q.         Based on that[,] based on your talking to Mr. Profaca and your experience, is it your opinion that the pain and the limitations that Mr. Profaca has in his neck and his back are related to the bus crash?
>
> A:          Yes.
>
> Defendants: Same objection, Your Honor. This expert is not qualified to talk about causation.
>
> The Court:   The objection is sustained.

32

Appellants' counsel moved along and did not make an offer of proof.

Dr. Bashir testified next. He is board certified and practices as a spine surgeon and an orthopedic surgeon. He treated both Profaca and Dale. He treated Profaca for herniated discs and stenosis of the spine, and he treated Dale for cervical pain and cervical radiculopathy, neck pain and numbness, and burning in his arm. Appellants' counsel asked him: "In your medical opinion what was the cause of Mr. Profaca's pain in his back?" The defense objected to speculation, and the trial court sustained the objection. The same thing occurred when he testified about Dale:

| | |
|---|---|
| Q. | And Doctor, based on your medical opinion, was the cause of mister—all of Mr. Dale, all the injuries that Mr. Dale has had and you performed, has all of this been from the bus crash? |
| Defendants: | Objection, Your Honor, calls for speculation. |
| The Court: | The objection is sustained. Rephrase your question, Counsel. |
| Plaintiffs: | I'll move on, Your Honor. |

No offer of proof was made. On redirect, however, the subject came up again, and this time some testimony about causation came in despite an objection:

| | |
|---|---|
| Q. | What is your opinion as to what caused the back injuries to Mr. Dale and Mr. Profaca? |
| Defendants: | Your Honor, for the record, I'm making the same objection. |
| A. | I believe it was the bus crash from February of 2020. |

Shortly thereafter, the witness was passed.

Dr. Srinivason Parthasarthy testified last. He is double board certified, and he testified as a lifecare planner for both Profaca and Dale. He did not treat Profaca or Dale, but he interviewed them and created lifecare plans estimating the costs of their past and future medical expenses. Appellants' counsel asked him what he believed caused Dale's injuries, and he responded, "[I]t's my conclusion that the bus crash of February 29 caused these injuries." Dr. Parthasarthy testified similarly about causation as to Profaca's injuries: "I believe the bus crash was the relevant [] cause of his injuries."

Appellants contend that the trial court erred in refusing to let the two treating doctors testify that the bus crash caused the injuries. Appellees respond that (1) appellants failed to preserve error by making an offer of proof under Rule of Evidence 103; (2) the trial court had discretion to exclude this testimony; and (3) there is no harm because comparable causation testimony came in anyway, mainly from Dr. Parthasarthy.

We disagree that appellants did not preserve error under Rule 103. That Rule provides that a party waives error in a ruling to exclude evidence only if the error affects a substantial right and the party "informs the court of [the excluded evidence's] substance by an offer of proof, unless the substance was apparent from the context." TEX. R. EVID. 103(a)(2). Appellants wanted Drs. Sanders and Bashir to answer a single yes-no question about causation. Although they did not make an

34

offer of proof about the substance of the excluded evidence, the affirmative responses were apparent from the context of the doctors' lengthy testimony. *See id.* Thus, appellants preserved error under Rule 103.

Having reviewed the record as a whole, however, we see no showing of probable harm from the rulings that sustained the objections on the ground of speculation. All three doctors expressly connected the bus crash to the injuries sustained by Profaca and Dale. It would have added nothing to have Drs. Bashir and Sanders do so a second time. *See Morale v. State*, 557 S.W.3d 569, 576 (Tex. 2018) (per curiam) (holding harmless any error in excluding evidence that "would have been duplicative"); *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 157 n.97 (Tex. 2014) (holding that exclusion was "harmless because the testimony excluded was in some form effectively obtained from other sources").

This analysis is reinforced by the very narrow scope of the testimony that appellants wanted to adduce: a single yes-no question to both doctors about causation. Appellants argue that Drs. Bashir and Sanders "would merely have confirmed that the accident caused the injuries they had been expounding on." Perhaps so, but this point about merely confirming causation shows why harm is so unlikely. If all appellants wanted was a "Yes" answer from the doctors when asked whether the bus crash caused appellants' injuries, they already obtained it. Dr.

Parthasarthy gave a "Yes" answer, as did Drs. Sanders and Bashir before defense counsel objected fast enough to keep their answers out. We conclude that appellants have not established harm from any error in the exclusion of this evidence.

We overrule appellants' second issue.

**Jury Charge Error**

In their third issue, Profaca and Dale challenge the definition of physical impairment in the jury charge.

**A.    Standard of Review**

Appellate courts generally review jury charge rulings for an abuse of discretion. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016). As with evidentiary rulings, we may not reverse a judgment for an erroneous jury-charge ruling unless the record reveals that the error was harmful. *Id.* at 728; TEX. R. APP. P. 44.1(a).

**B.    Analysis**

The jury charge in this case defined physical impairment as follows:

> "Physical impairment" means a substantial loss or diminution of [a plaintiff's] ability to engage in tasks or activities for his own benefit or enjoyment. In assessing damages for physical impairment, you may consider the loss of enjoyment of life. The effect of the physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages, or diminished earning capacity.

This formulation varies from the Pattern Jury Charge by using the word "substantial" twice instead of once. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas*

*Pattern Jury Charges: General Negligence, Intentional Personal Torts, & Workers'*

*Compensation* PJC 28.3 (2022).

Appellants accept the part of the definition requiring that the effect of physical impairment be substantial. However, they challenge the part of the definition stating that physical impairment "means a substantial loss or diminution" in the ability to engage in tasks or activities for one's own benefit or enjoyment. Appellants argue that the reference to "a substantial loss" erroneously heightened the standard. According to appellants, by "twice repeating the term 'substantial,' the instruction improperly tilted the jury to demand evidence of physical-impairment damages even more substantial than the law required."

We hold that using the word "substantial" twice in the definition of physical impairment was not erroneous. Requiring the loss to be substantial did not tilt the jury charge or heighten the physical impairment standard. Rather, it fixed the hurdle at the right height.

The requirement of a substantial loss goes back more than half a century when the Fourteenth Court of Appeals stated that "the plaintiff must sustain the burden of proving that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a *separate and distinct loss that is substantial* and for which he should be

compensated." *Green v. Baldree*, 497 S.W.2d 342, 350 (Tex. App.—Houston [14th Dist.] 1973, no writ) (emphasis added).

The 1973 formulation from *Green v. Baldree* soon spread throughout the state and has become the consensus standard: "The legal test for physical impairment is that 'plaintiff must sustain the burden of proving that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated.'" *Lawson-Avila Constr., Inc. v. Stoutamire*, 791 S.W.2d 584, 599 (Tex. App.—San Antonio 1990, writ denied) (quoting *Green*, 497 S.W.2d at 350).

Every court, including this Court, to consider the "loss that is substantial" standard has agreed with it.[9] *See, e.g.*, *Johnson v. Smith*, No. 01-94-00186-CV, 1994 WL 525864, at *4 (Tex. App.—Houston [1st Dist.] Sept. 29, 1994, no writ) (not designated for publication); *Robinson v. Minick*, 755 S.W.2d 890, 894 (Tex. App.—Houston [1st Dist.] 1988, writ denied). Fixing the hurdle at the right height helps to

---

[9]     *See, e.g.*, *Telesis/Parkwood Ret. I, Ltd. v. Anderson*, 462 S.W.3d 212, 242–43 (Tex. App.—El Paso 2015, no pet.); *Patlyek v. Brittain*, 149 S.W.3d 781, 785–86 (Tex. App.—Austin 2004, pet. denied) (op. on reh'g); *French v. Grigsby*, 567 S.W.2d 604, 607 (Tex. App.—Beaumont 1978, writ ref'd n.r.e.); *Gonzales v. Gilliam*, 506 S.W.2d 650, 653 (Tex. App.—Eastland 1974, no writ); *see also Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 554–55 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g) (stating that physical impairment requires "a separate loss that is substantial or extremely disabling"); *Loom Craft Carpet Mills, Inc. v. Gorrell*, 823 S.W.2d 431, 432 (Tex. App.—Texarkana 1992, no writ) (unpublished text) (stating that physical impairment requires "a separate, distinct, and substantial loss").

reduce the risk of damage overlap. The jury charge here illustrates the point. The charge broke the damage elements into twelve blanks, with past and future blanks for medical expenses, pain, mental anguish, lost earning capacity, disfigurement, and physical impairment.

Physical impairment has long bedeviled the courts with concerns about double recovery,[10] as discussed in *Golden Eagle Archery, Inc. v. Jackson. See* 116 S.W.3d 757, 764–70 (Tex. 2003). Given the requirement of a "separate and distinct loss that is substantial," and given the policy concerns about the risk of double recovery, the trial court had discretion to include the express reference to a substantial loss.

We overrule appellants' third issue.

---

[10] *See Robinson v. Minick*, 755 S.W.2d 890, 893 (Tex. App.—Houston [1st Dist.] 1988, writ denied) ("The intermediate appellate courts have shown extreme caution in reviewing claims for physical impairment because of justified concern to prevent a double recovery."); *Int'l-Great N. R.R. Co. v. King*, 41 S.W.2d 234, 236 (Tex. Comm'n App. 1931, holding approved) ("[I]f an issue or instruction submitted is calculated to confuse and mislead the jury into assessing double damages by inducing them to consider separately things which properly constitute but one element of recovery, it is erroneous.").

**Conclusion**

This opinion should not be interpreted as approval of the trial court's rulings excluding evidence about driver illness or the federal regulation. The Court holds only that those rulings, whatever their correctness, did not cause harm on the facts of this record. We affirm the trial court's judgment.

David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.